UNITED STATES of America,
Plaintiff–Appellee,

v.

George Perry POLLACK,
Defendant–Appellant.

No. 88–2749.

United States Court of Appeals,
Tenth Circuit.

Feb. 1, 1990.

Presiliano A. Torrez, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., and Tara C. Neda, Asst. U.S. Atty., with him on the brief), Albuquerque, N.M., for plaintiff-appellee.

James B. Foy (Charles A. Harwood with him on the briefs), Silver City, N.M., for defendant-appellant.

Before ANDERSON and BARRETT, Circuit Judges, and THEIS *, District Judge.

BARRETT, Senior Circuit Judge.

George Perry Pollack (Pollack) appeals his conviction following a jury trial of possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1).

---

* The Honorable Frank G. Theis, United States District Judge for the District of Kansas, sitting    by designation.

Prior to trial, Pollack moved to suppress the marijuana which was seized from the automobile he was driving and which was the basis of the indictment returned against him. At the suppression hearing, Border Patrol Agents Carroll and Sanchez testified on behalf of the United States. Stephen Stevers, an investigator, testified on behalf of Pollack, and Pollack testified on his own behalf.

Agent Carroll testified that: at approximately 3:00 a.m. on May 6, 1989, a red Datsun pickup was driven to the Truth or Consequences, New Mexico, Border Patrol checkpoint on northbound Interstate I–25; both occupants of the pickup identified themselves as United States citizens; as they started to leave the checkpoint, the driver of the pickup inquired as to the nearest gas station north; Agent Carroll related that the nearest gas station north was approximately seventy miles and that the nearest gas was back at Truth or Consequences.

Agent Sanchez testified that: he was working with Agent Carroll at about 3:00 a.m. on May 6, 1989, when a red 1979 Datsun pickup came to the checkpoint; upon being asked where the nearest gas would be, Agent Carroll directed the driver of the pickup back to Truth or Consequences; approximately 45 minutes later, the agents had two simultaneous sensor "hits" on Sensor 1185, old Highway 85; Highway 85 circumvents the Border Patrol checkpoint on the freeway; Highway 85 parallels the freeway and has access back onto the freeway approximately two miles north of the checkpoint; Highway 85 is a well-documented alien smuggling route and "we've" apprehended many alien smuggling loads on that route; the two simultaneous hits indicated that there were two vehicles traveling one behind the other; he and Officer Carroll drove to Interchange 83 (Highway 85 access to I–25) to intercept the vehicles; the first vehicle to pass was the 1979 red Datsun pickup which had previously passed through the checkpoint on I–25; immediately behind the pickup was a 1972 Buick with Colorado plates; the 1972 Buick was significant to him as a Border Patrol agent because it is a very large

vehicle into which a large number of people can fit; the Colorado plates were significant because Colorado is a common destination for loads of illegal aliens; and the actions of the pickup, coming through the checkpoint, finding a reason (the nearest gasoline) to go back to Truth or Consequences, and coming back north from Truth or Consequences through the smuggling route circumventing the checkpoint was a classic alien-smuggling pattern.

Agent Sanchez also testified that: Pollack was driving the Buick; when asked about his citizenship, Pollack produced a Colorado driver's license; Pollack's hands were shaking when he produced the driver's license; the Buick appeared to be heavily loaded and riding lower in the rear end; Pollack refused to open the trunk when requested to do so and told Agent Sanchez that they needed a search warrant to look into the trunk; he was relatively sure that there was a load in the trunk of the Buick; they drove approximately two miles back to the checkpoint to open the trunk because it was "not real safe" to open the trunk on the off-ramp where Pollack had been stopped; once back at the checkpoint the three suspects, including Pollack, were advised of their rights; when he opened the trunk he immediately detected the odor of marijuana.

On cross-examination, Agent Sanchez testified that: he had been a Border Patrol agent for a little over ten years and had been continuously stationed at the Truth or Consequences checkpoint; a lot of legitimate traffic travels on Highway 85; at that time of the day (3:00–3:45 a.m.), it is very unlikely to have a vehicle on Highway 85 but it is not unprecedented; the Border Patrol does not stop every vehicle; at that hour a very, very small percentage of traffic that is stopped on Highway 85 is legitimate traffic; he did not keep official statistics on stops and arrests; it was not decided to intercept the two vehicles prior to actually seeing them; the purpose of the lead car coming through the checkpoint is to determine if the checkpoint is open and to scout ways around the checkpoint; the vast majority of people that he stops who

are American citizens are not the least bit nervous; Pollack related that the car belonged to someone else; it is common for a smuggler not to use his own vehicle; a check on the vehicle indicated that it was not stolen; the rear bumper of the car appeared to be noticeably lower than the front bumper; he did not hear any unusual sounds coming from the trunk; he did not smell any unusual odors coming from the trunk; when asked, Pollack said he had clothes in the trunk; he did not attempt to secure a search warrant.

Stephen Stevers, an investigator for Pollack, identified photographs of the Buick and testified that: the rear end of the Buick dropped only ⅜ " when fifty pounds of sand were loaded in the trunk; he could not detect that the car was lower when loaded with the sand; but for taking a measurement he would not have been able to determine that the car was ⅜ " lower after it was loaded with the sand; and he could not detect a difference in the appearance of the vehicle when, in addition to the sand in the trunk, counsel for Pollack (weighing approximately 130 pounds) also sat on the trunk.

Pollack testified that: his first contact with the Border Patrol agents on the day in question was between 3:00 a.m. and 4:00 a.m.; upon request, he gave Agent Sanchez his Colorado driver's license; neither Agent Sanchez nor Agent Carroll inquired about his citizenship; after Agent Sanchez asked for his driver's license, he (Agent Sanchez) asked Pollack to open the trunk of the car; he told Agent Sanchez he would open the trunk if they had a search warrant; Agent Sanchez got very angry and said that the car was going nowhere and that "I'm going to open the trunk one way or another;" he did not see the red truck in front of him before they were stopped; Agent Carroll asked him to get out of the car after which Agent Carroll frisked him down and asked him a lot of questions; he told Agent Carroll he was going to Colorado Springs and that he had clothes in the trunk of the car; he did not consent to the search of the trunk; he could not leave; he told Agent Carroll that he did not "know" the red pickup and that he thought it was the Border Patrol; when they got back to the checkpoint, Agent Sanchez got all hot and told him to park his car in a specific location; after he parked the Buick, he handed the keys to Agent Sanchez; once inside the Border Patrol office, they were read their "rights"; he understood his rights; when Agent Sanchez started to open the trunk, he (Agent Sanchez) stated that they did not need a search warrant, and that they had probable cause because Pollack was sneaking around.

Pollack also testified that: after Agent Sanchez opened the trunk, he opened a blue nylon bag (full of marijuana); after Agent Sanchez opened the nylon bag, he stated "now you're under arrest;" neither of the agents commented that the car looked like it was heavily loaded; he owned the blue nylon bag and the 27 pounds of marijuana inside it; there was no odor of marijuana when Agent Sanchez opened the trunk; the suitcase and marijuana probably weighed about 44 pounds.

Within its oral findings and conclusions, the district found: Highway 85 is a well-documented alien smuggling route; the two sensor hits reflected two vehicles were passing one right after the other; Agents Carroll and Sanchez decided to investigate the sensor hits based on Sanchez' ten years of experience and the fact that the two sensor hits occurred at 3:00 a.m. in an area famous for drug smuggling; Agent Sanchez observed that the vehicle appeared to be riding low in the rear; after Pollack refused permission to look in the trunk and insisted upon a warrant, Agent Sanchez believed that the car and pickup were involved in alien smuggling; when they returned to the checkpoint, Agent Sanchez detected an odor of marijuana; the actions of the agents were in keeping with a *Terry* stop because the circumstances of the hour, the two sensor hits, the red pickup in company with the Buick, gave them reasonable cause to believe that a crime had been committed; that the court's own view of Defendant's Exhibit A (photograph of the Buick) is that the car appears to sit low in the back. Thereafter, the court entered an order denying Pollack's motion to suppress.

On appeal, Pollack contends: (1) the stop was not based on reasonable suspicion; (2) the search was executed without probable cause; and (3) he was unlawfully detained after the initial stop.

## I.

■ Pollack contends that the stop was not based upon reasonable suspicion. Pollack argues that although the government justifies the stop by contending that the red Datsun pickup was the scout vehicle, the record is not clear as to what happened to the two occupants of the red Datsun. Pollack maintains that there was no evidence linking the two vehicles or their occupants directly to each other and no conspiracy charges were filed against Pollack or the occupants of the Datsun pickup.

Pollack further argues that Truth or Consequences was not the functional equivalent of the border, that probable cause was necessary to stop the Pollack vehicle, and that the observations of the officers did not give rise to probable cause to suspect that the vehicle which Pollack was driving contained illegal aliens. Pollack reasons that inasmuch as he was a blonde-haired, Anglo male and there was nothing to tie the two vehicles together, other than the fact that they were using the same public highway at the same time, the circumstances upon which the agents attempt to justify the stop do not meet the standards of *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Pollack also cites *United States v. Melendez-Gonzales*, 727 F.2d 407 (5th Cir. 1984) for the proposition that a stop must be justified by the facts known to the agents at the time that a person's freedom is restricted.[1]

In response, the government reasons that specific articulable facts reasonably warranted Pollack's stop. The government cites to *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) for the proposition that "Any investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." In reviewing the conditions under which police officers may stop a person, the *Cortez* Court opined:

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. See, *e.g.*, *Brown v. Texas, supra*, [443 U.S. 47] at 51 [99 S.Ct. 2637 at 2640, 61 L.Ed.2d 357 (1979)] *United States v. Brignoni-Ponce, supra* [422 U.S.] at 884 [95 S.Ct. at 2581]. (footnotes omitted)

449 U.S. at pp. 417–18, 101 S.Ct. at 694–95.

In *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Court opined:

The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' In evaluating the validity of a stop such as this, we must consider the 'totality of the circumstances—the whole picture.' *United States v. Cortez*, 449 U.S. 411, 417 [101 S.Ct. 690, 695, 66 L.Ed.2d 621] (1981). As we said in *Cortez:*

1. The factual setting in *United States v. Melendez-Gonzales* parallels our case, with certain exceptions including: neither of the vehicles observed in *Melendez-Gonzales* were engaged in any activities similar to those of the red Datsun pickup; the officers were stopping every vehicle that crossed over the sensors; the two sensor hits were two minutes apart; and the two vehicles were observed twenty to twenty-five minutes later coming into town together. In *Melendez-Gonzales*, the court held, after delineating the objective factors which Border Patrol agents may consider in determining whether to stop a vehicle, that the agents lacked probable cause to stop and search the defendant's vehicle.

The process does not deal with hard certainties. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers. *Id.* at 418 [101 S.Ct. at 695].

109 S.Ct. at 1585.

Within *Cortez,* the Court also reiterated the standards set forth in *United States v. Brignoni–Ponce:*

We have recently held that stops by the Border Patrol may be justified under circumstances less than those constituting probable cause for arrest or search. *United States v. Brignoni–Ponce,* 422 U.S., at 880 [95 S.Ct. at 2579]. Thus, the test is not whether Officers Gray and Evans had probable cause to conclude that the vehicle they stopped would contain "Chevron" and a group of illegal aliens. Rather the question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity. On this record, they could so conclude (footnotes omitted).

449 U.S. at 421–22, 101 S.Ct. at 697.

In *United States v. Leyba,* 627 F.2d 1059, 1062–63 (10th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980), we quoted *United States v. Brignoni–Ponce* prior to detailing the factors which Border Patrol agents may consider prior to stopping a particular vehicle and questioning its occupants:

In the immigration field, agents on roving patrol, as here, may properly consider the following factors in determining whether there exist 'specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country,' *United States v. Brignoni–Ponce, supra,* 422 U.S. at p. 884, 95 S.Ct. at p. 2582, thus justifying the stop of a particular vehicle and the limited questioning of its occupants: (1) the physical charac-

teristics of the area in which the vehicle is stopped; (2) patterns of traffic on the road; (3) proximity to the border; (4) previous experience with alien trafficking in the area; (5) information about recent border crossings; (6) attempts to evade detection; (7) appearance of the vehicle; (8) appearance and behavior of the driver and passengers; and (9) other relevant information. *Id.* at pp. 884–885, 95 S.Ct. at pp. 2581–82; *United States v. Sperow,* 551 F.2d 808 (10th Cir.1977), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1971).

Mindful that police officers must have a particularized and objective basis for suspecting the person stopped of criminal activity, based on "the whole picture," *United States v. Cortez, supra,* and mindful that experienced Border Patrol agents may stop a vehicle that they reasonably surmise to be engaged in a criminal activity, *United States v. Brignoni–Ponce, supra,* coupled with the factors that Border Patrol agents may consider as set forth in *Leyba, supra,* we hold that the stop of Pollack was based upon reasonable suspicion.

The undisputed facts establish that Pollack was stopped between 3:00 and 3:45 a.m. on a well-documented alien smuggling route; Pollack was driving a large vehicle capable of hauling a large number of people; Pollack was intercepted after road sensors indicated two vehicles traveling one behind the other on a highway circumventing the Border Patrol checkpoint on Interstate I–25; the red Datsun pickup traveling directly in front of Pollack had originally gone through the checkpoint, found a reason to return to Truth or Consequences, and thereafter had come back north through the smuggling route, followed by Pollack, circumventing the checkpoint in a classic alien smuggling pattern; traffic was very unlikely on Highway 85 between 3:00–3:45 a.m.; and, at that hour, a very, very small percentage of the traffic stopped on Highway 85 was legitimate traffic.

These factors, when considered in the aggregate, gave rise to a reasonable suspicion justifying stopping Pollack. These

same factors, in our view, gave rise to probable cause to arrest Pollack after he was stopped and questioned.

In *Adams v. Williams*, 407 U.S. 143, 148–49, 92 S.Ct. 1921, 1924–25, 32 L.Ed.2d 612 (1972), the Court opined:

> Probable cause to arrest depends 'upon whether, at the moment the arrest was made ... the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' *Beck v. Ohio*, 379 U.S. 89, 91 [85 S.Ct. 223, 225, 13 L.Ed.2d 142] (1964).

Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. See *Draper v. United States*, 358 U.S. 307, 311–12 [79 S.Ct. 329, 331–32, 3 L.Ed.2d 327] (1959). Rather, the court will evaluate generally the circumstances at the time of the arrest to decide if the officer had probable cause for his action:

> 'In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States*, 338 U.S. 160, 175 [69 S.Ct. 1302, 1310, 93 L.Ed. 1879] (1949).

Applying these standards to the instant case, we hold that Agent Sanchez had probable cause to arrest Pollack based on the "facts and circumstances within [the arresting officers'] knowledge."

Agent Sanchez testified that after he stopped the Buick, he questioned Pollack; Pollack's hands were shaking; the car appeared to be heavily loaded; in his opinion the back bumper was lower than the front bumper; and that he was relatively sure that there was a load in the trunk of the Buick. We hold that these facts and circumstances, when considered in the aggregate, gave these experienced Customs agents particularized, trustworthy information sufficient to warrant their belief that Pollack was committing a crime. We hold that the officers had probable cause to arrest Pollack and to search the trunk of the Buick.

## II.

■ Pollack contends that the search was executed without probable cause.

Pollack maintains that Agent Sanchez opened the trunk of the car without consent or probable cause[2] and that the facts relied upon by the government did not constitute probable cause to search the car under *Almeida Sanchez v. United States*, 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973) ("Automobile or no automobile, there must be probable cause for the search."). Pollack acknowledges that although the smell of marijuana by an officer establishes probable cause to search a vehicle under *United States v. Merryman*, 630 F.2d 780 (10th Cir.1980), the agents did not have probable cause here inasmuch as marijuana was detected only after the trunk was open.

The government responds that because there was probable cause to search the car after Pollack was stopped and arrested, the move of the car to and subsequent search at the checkpoint were proper. The government reasons that probable cause is a flexible common sense standard under *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), and that probable cause exists when the facts and circumstances known to the officer would lead a prudent person to believe an offense had been committed. *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). We agree.

2. Pollack notes that the district court, in finding that the agents had probable cause to search the trunk, erroneously found that Agent Sanchez detected the odor of marijuana prior to opening the trunk of the car. This finding was in error.

Agent Sanchez testified that he did not smell any unusual odors coming from the trunk (R., Vol. II at p. 45) but that when he opened the trunk, the "whole trunk smelled like marijuana." *Id.* at 48.

Inasmuch as Agent Sanchez had probable cause to arrest Pollack, the search of his car incident to that arrest was lawful. *Adams v. Williams, supra; Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

### III.

■ Pollack contends that he was unlawfully detained after he was stopped. After Pollack was stopped and questioned by Agent Sanchez, he was further questioned by Agent Carroll for approximately fifteen minutes. Thereafter, Pollack was required to drive the Buick back to the checkpoint. Once at the checkpoint, Pollack was taken inside, advised of his rights and thereafter taken outside where Agent Sanchez opened the trunk of the Buick and discovered the marijuana. After Agent Sanchez discovered the marijuana, he advised Pollack that he was under arrest. Pollack testified that fifteen to twenty minutes lapsed between the time that they arrived at the checkpoint and the time that Agent Sanchez searched the car.

Pollack reasons that even if it is determined that the stop was justified, the agents nevertheless exceeded the limits of a lawful investigative detention by detaining him without his consent. Pollack relies on *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), *United States v. Recalde,* 761 F.2d 1448 (10th Cir. 1985), *United States v. Gonzales,* 763 F.2d 1127 (10th Cir.1985), and *United States v. Lopez,* 777 F.2d 543 (10th Cir.1985). These cases, however, are clearly distinguishable. Most significant is our holding that the agents had probable cause to arrest Pollack after he was stopped and questioned.

Whereas Pollack's initial stop was based on a reasonable suspicion and his subsequent arrest and the search of the trunk of his car were based on probable cause, probable cause was not present in *Hayes v. Florida* (in the absence of probable cause to arrest or consent to journey to the police station, investigative detention violated Hayes' Fourth Amendment rights); *United States v. Recalde* (officers, lacking probable cause, improperly transported Recalde

without his consent in the hope of developing probable cause); or *United States v. Gonzales* (state patrolmen who was unable to articulate particular facts establishing probable cause could not require Gonzales to accompany him to the police station). In *United States v. Lopez,* we upheld the detention of Lopez and his vehicle at a New Mexico State Police roadblock. We there held that the officers "had reasonable and articulable suspicion that the car might be stolen" thereby justifying the brief investigatory detention. 777 F.2d at p. 547.

Here, the initial stop of Pollack was predicated on Agent Sanchez' reasonable suspicion that a crime was being committed. Following Pollacks's arrest, the delay in conducting the search of the trunk occurred by reason of the return to the checkpoint based on Agent Sanchez's concern for safety:

Q. [Mr. Gorence for the United States] And why did you request that both the Datsun pickup and the '72 Buick go all the way back to the checkpoint rather than ascertaining right then and there out in the middle of nowhere what was in the trunk? Why did you want to go all the way back?

A. [Agent Sanchez] We didn't open the trunk at the very beginning right when we stopped Mr. Pollack—well, for safety reasons. He was on the on-ramp, he did stop on the on-ramp. If there were people in it, they have a tendency to bust on us. As soon as you open the trunk, everybody flies out and everybody runs.

And it's quite uncontrolled environment right there, whereas at the checkpoint there's lights, it's more of a controlled setting.

Also I didn't stop on the way back to the checkpoint because then we had three suspects plus what was in the trunk, whatever it was in the trunk, and there was only two of us, we had no backup, there was only two of us working that shift. For safety reason, we went back to the checkpoint.

(R., Vol. II at p. 18).

■ Giving due consideration to the time of the stop, the fact that the stop occurred

in an area famous for illegal alien and drug smuggling, and Agent Sanchez' concern for safety, we hold that the delay following his arrest was not unlawful. We recognize that a search incident to a valid arrest must be conducted substantially contemporaneous with the arrest and generally confined to the immediate vicinity of the arrest. *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). A search which is remote in time or place following a valid arrest cannot be justified, absent exigent circumstances. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). In *Malone v. Crouse*, 380 F.2d 741 (10th Cir.), *cert. denied*, 390 U.S. 968, 88 S.Ct. 1082, 19 L.Ed.2d 1174 (1968), we held that a search of the defendant's suitcase at the police station about an hour after his valid arrest at another place constituted a search contemporaneous with the arrest.

Assuming, *arguendo*, that Pollack was not arrested until after Agent Sanchez opened the trunk of the Buick and discovered the marijuana, we nevertheless hold that the actions of the agents did not exceed the limits of a lawful investigative detention. Every arrest and every seizure having the essential elements of a formal arrest is unreasonable unless supported by probable cause. *Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981). In assessing whether a detention is too long to be justified as an investigative stop, it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 676, 105 S.Ct. 1568, 1570, 84 L.Ed.2d 605 (1985). The Supreme Court there observed:

> A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second guessing.... A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. 470 U.S. at 686–87, 105 S.Ct. at 1575–76.

After Pollack was stopped, Agent Sanchez left Agent Carroll with Pollack and pursued after the Datsun pickup. After intercepting the pickup, Agent Sanchez, the occupants of the pickup and Pollock drove back to the checkpoint located approximately two miles south of where Pollack had been stopped. In so doing, Agents Sanchez and Carroll were acting in accordance with *United States v. Sharpe, supra* (diligently pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly).

AFFIRMED.